IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREW BELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 11 C 686 |
| ) | |
| CITY OF HARVEY, ILLINOIS, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Andrew Bell ("Bell") charges that the City of Harvey, Illinois ("City") is liable to him under 29 U.S.C. §623(d), the anti-retaliation provision of the Age Discrimination in Employment Act ("ADEA"). Specifically, Bell claims that City retaliated against him after he engaged in the statutorily protected activity of filing an age discrimination claim with the Equal Employment Opportunity Commission ("EEOC"). City has filed a Fed. R. Civ. P. ("Rule") 56 motion for summary judgment, which Bell contests. For the reasons stated below, City's motion is denied.

**Standard of Review**

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.

2002)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**Factual Background**

This section sets out a summary of the facts viewed in the light most favorable to nonmovant Bell. That generous approach may, however, be subject to any limitations created by the extent of Bell's compliance (or noncompliance) with the strictures of this District Court's LR 56.1, adopted to implement Rule 56.[1]

Bell, a 52 year-old male, is employed as a police officer by

---

[1] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. This opinion cites to City's LR 56.1 statement as "C. St. ¶--," to Bell's response as "B. Resp. ¶--" and to City's reply as "C. Reply ¶--." Bell's statement of additional material facts is cited "B. St. ¶--" and City's response is cited as "C. Resp. ¶--." Citations to exhibits attached to those documents will add "Ex. --" to the appropriate document designation. Certain exhibits also contain exhibits themselves. Such sub-exhibits will be cited using an additional number attached to the exhibit number itself (e.g. "C. St. Ex. 1-19" for Bell's deposition, which is sub-exhibit 19 within City's Ex. 1). Where a party does not dispute the adversary's original statement, or where a party's challenge to an asserted fact is lacking in legal or evidentiary support, this opinion cites only that original statement.

City and has served as a sergeant in the patrol division since 1999 (C. St. ¶¶1, 6). In February 2007 City granted a variety of promotions but did not promote Bell, although he was eligible for several positions that would have entailed an increase in his salary (id. ¶25). On August 17, 2007 Bell filed a charge of age discrimination with the EEOC, asserting that he was denied a promotion and demoted in violation of the ADEA (id. ¶26). Bell now claims that soon after that filing City began subjecting him to various retaliatory actions that, he believes, were in response to his filing of a discrimination charge and later retaliation charges.

First among those allegedly retaliatory actions was a September 25, 2007 written reprimand that stemmed from an incident that had occurred on September 5 (C. St. ¶¶28-29, 32). On that date Bell worked as the Watch Commander for the evening shift that began at 11 p.m. (id. ¶28). As Watch Commander Bell was responsible for ensuring that all the divisions in the building were staffed and, accordingly, for notifying appropriate personnel when employees called in sick (id.).

Around 7 p.m. that evening--when Bell was still at home sleeping--one of the clerks called in sick for her shift (C. Resp. ¶¶3-4). Bell did not learn that the clerk had called in sick until approximately 3 a.m. the following morning (C. Resp. ¶5). At that time Bell asked the dispatchers if they had

notified Commander of the Service Bureau Cynthia Haynes ("Haynes")(B. Resp. ¶30(d)).

Because Haynes was never notified, Commander Charles Sampson ordered Sergeant White to issue Bell a written reprimand for failure to supervise properly (C. St. ¶32). That reprimand was placed in Bell's personnel file but had no effect on his pay (C. St. ¶32). Bell perceived the reprimand to be an act of retaliation, so he filed a charge with EEOC on September 27, 2007 (id. ¶27).[2]

Bell filed a second EEOC retaliation charge on February 5, 2009, asserting that City retaliated by not rotating him to the first shift or "day shift" in 2008 (C. St. ¶39). Although there was no written policy regarding shift rotations, it was City's departmental procedure that every officer would work all three shifts--day shift, afternoon shift and midnight shift--during a year (C. St. ¶35). Typically officers were rotated to the next earlier shift every four months (B. St. Ex. 1 at 76-77). In 2008, however, City experienced a shortage of sergeants that left it with only seven or eight to cover the daily shifts (C. St. ¶37). Given those numbers, only two sergeants were assigned to the day shift (C. St. ¶37) while three sergeants were assigned to the afternoon shift (B. St. Ex. 2, p. 23). That being the case,

---

[2] Bell did not file a complaint with his union representative for that or any other adverse action taken by City.

4

not all three sergeants assigned to the afternoon shift could be rotated to the day shift.

In December 2007 Bell bid on and received the second shift as his starting shift for 2008 (B. St. Ex. 1 at 76). Instead of being rotated to the day shift in May, however, Bell was rotated to the midnight shift. For his final shift of the year, Bell was rotated to the second shift again (id.). Bell filed his second retaliation charge on that basis.

Bell filed a third retaliation charge with EEOC on March 30, 2009, claiming that City had retaliated against him for filing his February 5, 2009 charge by suspending him for one day without pay (C. St. ¶40). City's stated reason for the suspension was Bell's alleged abuse of sick time (id.). In early March 2009 Acting Chief Denard Eaves ("Eaves") issued a formal disciplinary action letter to Bell stating that he had "developed a pattern of calling in sick either the day before...or the day after [his] scheduled days off" (C. St. Ex. 1-24). That letter noted 14 days on which Bell had taken sick days in conjunction with his regular days off and stated that such actions violated City's Operations Manual (specifically Section 2.41.10 (incompetence)). There was seemingly no specific rule prohibiting the use of sick time in conjunction with off days at the time of Bell's suspension.

Eaves stated in his deposition that he had ordered former Patrol Sergeant Camille Damiani ("Damiani") to investigate Bell's

5

attendance record in response to Bell's request for approval of secondary employment. That, however, is impossible (and hence false), for Bell did not submit his eventually-denied request for secondary employment until April 2008, three months <u>after</u> having been disciplined for sick time abuse (B. Resp. ¶52). For her part, Damiani--who has worked for Harvey for 23 years--testified that she was not aware of any employee being suspended for sick time abuse before Bell (C. Resp. ¶18), despite the fact that using sick days near regular days off was common practice (<u>id</u>. ¶20). She did recall that in 2008 City's Mayor wanted to institute a policy to prevent abuse of sick time, but she was not aware of any official rule being adopted (B. St. Ex. 2 at 20-21). As City points out, at least four officers were punished for abusing sick time after Bell's suspension, including one officer notified of his suspension approximately one week after Eaves' letter to Bell.[3] That notification specifically cited section 2.41.81 of City's Operation Manual entitled "abuse of sick leave benefit" (<u>id</u>.), although no such section appears in the version of the Operation Manual entered into the record (B. St. Ex. 1-

---

[3] Eaves' disciplinary letter to Bell was undated, but various contextual clues help place it temporally. First, the final date listed for Bell's sick leave abuse was March 8, 2009, showing that it was issued on or after that date. Second, Eaves' letter to Bell was numbered as disciplinary action #11-09 (B. St. Ex. 1-24), while the letter to Officer Bridges was numbered disciplinary action #14-09 (B. St. Ex. 1-25), showing that it was the third disciplinary action issued after Bell's.

6

20).

Bell next complains about the earlier-mentioned denial of his application for secondary employment. In September 2008 Bell was approved by Commander Roy Wells ("Wells") and Eaves to work a secondary job as a police liaison officer at a local school on a part-time basis (C. St. ¶51). Because approvals for secondary employment lasted for six months, Bell had to reapply in March 2009 (H St. Ex. 1-22).

On April 15, 2009 Bell submitted an application for secondary employment, requesting permission to work at the same local school at which he had been working since September 2008 (B. St. ¶¶14, 21). Wells recommended denial, and Eaves denied Bell's request on May 14, 2009 without a stated reason (B. Resp. ¶53), even though the Operation Manual required a written justification from the bureau commander and the chief of police (C. St. Ex. 7). In his deposition Eaves said that he denied Bell's request based on his then-recently-documented sick time abuse (B. St. Ex. 4, p. 12). Wells testified that he recalled Eaves denying a secondary employment request in 2011 for another City officer for the same reason (C. St. ¶54). Bell did not file a charge of retaliation with EEOC in relation to that action, and he never reapplied for secondary employment (C. St. ¶55).

City's final disciplinary action occurred on November 17, 2009 when Eaves issued a written reprimand to Bell for failing to

7

document his October 20 roll call notes properly (C. St.¶ 56). At the beginning of each shift the shift commander was provided a patrol form containing pre-typed notes about rules and regulations that the commander was required to read to his officers (id. at 57). If there was any additional information regarding events from the previous shift, the shift commander was required to document that information (id.). According to Damiani both Wells and Eaves were "very picky" about sergeants documenting their roll call by handwriting the issues they discussed with their officers (B. St. Ex. 2 at 18-19), but "a lot of people didn't do them" (id. at 17). After Bell failed to handwrite his roll call notes on October 20, 2009, Eaves took disciplinary action. Bell's excuse, according to Eaves, was that "[he] felt it was redundant to duplicate roll call notes" (B. St. Ex. 1-26). Bell's reprimand was placed in his personnel file but did not result in any loss of pay or time (B. Resp. ¶60). He did not file a charge of retaliation with EEOC regarding that action.

On October 28, 2010 EEOC issued a right-to-sue letter to Bell. Shortly thereafter Bell filed this action.

**Bell's Secondary-Employment-Denial Claim is Time-Barred**

City argues that Bell's claim based upon the denial of secondary employment is time-barred under ADEA, given that Bell never filed an EEOC charge as to his 2009 denial of secondary employment, nor did he mention the denial in his Amended

8

Complaint. Bell does not deny those facts, thus conceding that a claim based on City's denial of secondary employment would be time-barred. Nonetheless Bell correctly asserts that he may use the denial of his request as "background evidence" to support a timely claim (Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)).

**Retaliation Claim**

To survive the balance of the current summary judgment motion, Bell must establish a genuine issue of material fact as to whether City engaged in retaliation against him for filing ADEA charges of discrimination and retaliation with EEOC.[4] Two proof frameworks are available to reach that end: (1) the direct approach, where a plaintiff adduces direct evidence of the employer's discriminatory intent or creates a "convincing mosaic of discrimination" out of pieces of circumstantial evidence (Troupe v. May Dep't Stores Co., 20 F.3d 734, 737 (7th Cir. 2004)), and (2) the indirect approach, which employs the sequential burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Bell relies solely on the direct method to prove retaliation by arguing that a "mosaic of circumstantial evidence" exists that

---

[4] Many of the cases cited and discussed below are based on claims brought under the anti-retaliation provision of Title VII, which our Court of Appeals has recognized as parallel to ADEA's anti-retaliation provision (Vepringsky v. Fluor Daniel, Inc., 87 F.3d 881, 884 n.1 (7th Cir. 1996)).

9

defeats City's summary judgment motion. Under that method Bell must show that "(1) [he] engaged in protected activity; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the two" (Smith v. Lafayette Bank & Trust Co., 674 F.3d 655, 657 (7th Cir. 2012)). Neither party disputes that Bell engaged in statutorily protected activity. Where they diverge is as to whether Bell suffered an adverse employment action and, if so, whether any of the actions had a causal connection to Bell's EEOC charges.

**Materially Adverse Actions**

Bell asserts that he suffered at least five adverse employment actions: two written reprimands, an arbitrary shift assignment, a denial of his request to work secondary employment and a one-day suspension without pay. Though those actions may be adverse, the ADEA requires that employment actions be materially adverse--that is, "severe enough to dissuade a reasonable employee from exercising statutory rights" (Barton v. Zimmer, Inc., 662 F.3d 448, 456 (7th Cir. 2011)). As Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006) teaches, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." Each of the assertedly adverse actions, other than the already dispatched denial-of-secondary-employment claim, will be addressed seriatim with Burlington N.'s standard in mind.

10

This opinion turns first to Bell's two written reprimands. Benuzzi v. Bd. of Educ., 647 F.3d 652, 665 (7th Cir. 2011) makes clear that "[g]enerally, written warnings, standing alone, do not constitute materially adverse actions." Written reprimands may constitute materially adverse actions in certain instances, such as when the written warning cites petty misdeeds that occurred months ago or where the warning specifies that formal disciplinary proceedings are imminent (id.). No such circumstances were present in Bell's case, and the reprimands did not entail any loss of pay or work time. So the written reprimands do not constitute adverse actions for the purposes of Bell's retaliation claim.

Next to be considered is Bell's one-day suspension without pay on March 30, 2009. Economic loss caused by a suspension without pay can indeed constitute a materially adverse action to sustain a retaliation claim, as Burlington N., 548 U.S. at 72-73 demonstrates. Following suit, our Court of Appeals has found that suspensions without pay may "undoubtedly satisfy the materially adverse standard" (Benuzzi, 647 F.3d at 665). But the suspensions in Burlington N. (37 days without pay) and Benuzzi (30 days cumulatively without pay) were of much greater durations than Bell's one-day suspension, and they were therefore far more adverse. Indeed, the suspension in Burlington N. was considered materially adverse due to the "serious hardship" a reasonable

11

employee would face having to go "a month without a paycheck." By contrast, the "hardship" caused by a one-day suspension would appear to be de minimis at most, and it strains credulity to assert that a reasonable employee would forgo the opportunity to report discriminatory behavior in order to avoid the loss of a single day's pay. Whittaker v. N. Ill. Univ., 424 F.3d 640, 647 (7th Cir. 2005) does state in dictum that a three-day suspension without pay would constitute a materially adverse action, but for support it cites only to the fact that most materially adverse actions involve economic harm. Absent a stronger precedential statement to the contrary, this Court will not find a one-day suspension without pay, with no aggravating circumstances, to be a materially adverse action.

Last to be considered is the total denial of any day shift assignment to Bell during 2008, which he has characterized as an "arbitrary shift assignment." As Goodman v. National Sec. Agency, Inc., 621 F. 3d 651, 654-55 (7th Cir. 2010) teaches, a change in hours would generally not on its own be sufficient to dissuade a reasonable employee from filing a discrimination charge. Instead some harm from that change particular to the plaintiff must be shown (id.). In Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 662-63 (7th Cir. 2006), for example, a seemingly innocuous change of an employee's schedule--from a 7 a.m to a 9 a.m. start time--turned out to be materially adverse,

12

given that it impacted the employee's ability to care for her special-needs child in the afternoon.

In this instance the four-month-long scheduling decision that required Bell to begin his shift at 4 p.m. instead of 8 a.m. involved a far more drastic change than that at issue in Washington. To be sure, Bell has not particularized the reason or reasons supporting a claim of materiality as the successful plaintiff did in Washington. But it should be recognized that Bell's entire presentation of what he considered as retaliatory conduct was intended to portray the Troupe-described "convincing mosaic of circumstantial evidence," obviously prepared without knowing (and thus without focusing on) what this Court would hold to be the only potential candidate for finding a materially adverse action by City. In that respect Bell should have the opportunity to provide specifics as to any particularized hardship imposed on him in consequence of his inability to work the first shift for four months, after which City will of course be given time to counter Bell's position.[5]

This Court will therefore withhold judgment on this motion until the parties have an opportunity to present evidence on the

---

[5] This is concededly an unusual procedure in the environment of summary judgment, but this Court finds it appropriate given the nature of the parties' presentations to this point. Importantly, the law's placement on Bell of the burden of showing materiality, coupled with the application of the principles stated in the "Standard of Review" section of this opinion, will govern the rule of decision by this Court.

issue at hand.  If Bell is unable to submit sufficient evidence to reflect the materiality of his change in hours, City's summary judgment motion will be granted.

**Causation**

If Bell can in fact put forth evidence to satisfy what has just been said as to City's decision not to put him on the first shift, he must also show that the adverse action was taken because of his statutorily protected activities.  To prove causation under the conventional ADEA discrimination claim, a plaintiff must prove that his age was a but-for cause of the adverse employment actions taken against him (see Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009)).  Barton, 662 F.3d at 455-56 has extended that requirement to retaliation claims under the ADEA as well, so that Bell must show that City would not have denied him his desired shift but for his complaints.

To that end Bell may again rely on either direct evidence or circumstantial evidence (Coleman v. Donahoe, 667 F.3d 835, 860 (7th Cir. 2012)). Direct evidence, which "essentially requires an admission by the employer," is predictably "rare" (Bender v. Bellows & Bellows, 515 F.3d 757, 764 (7th Cir. 2008)) and is not present in this case. Bell must therefore rely on circumstantial evidence to create the inference of retaliatory intent.

Three flavors of circumstantial evidence are generally recognized by our Court of Appeals (see Coleman, 667 F.3d at

860).  First, plaintiffs may offer evidence of suspicious timing, ambiguous statements and other pieces of context that create an inference of retaliatory intent (id.).  Second, plaintiffs may rely on evidence that similarly situated employees who did not engage in protected activity also did not suffer adverse actions (id.).  Last among the alternatives is evidence that the employer offered a pretextual reason for the adverse action (id.).[6]

Bell has very little in the way of evidence proving retaliatory intent in the context of what may be found to be the materially adverse action itself (that is, the scheduling of his shifts).  After all, City has a potentially innocent explanation for why Bell did not work a first shift in 2008: the first shift requires fewer sergeants, so not everyone can work the first shift in a calender year.  But that does not explain why Bell--and not one of the other six or so sergeants in the same position--was chosen to work one third shift and two second shifts rather than one shift of each type.  Nonretaliatory motives certainly could explain the decision, but retaliatory motives would do the job just as well.

True enough, that fact alone would not qualify as a "convincing mosaic" from which a jury could infer a retaliatory

---

[6] As stated earlier, evidence suggesting a retaliatory intent with regard to adverse, but not materially adverse, actions is still relevant to the question of causation, for it tends to show that City harbored retaliatory intent generally (cf. Coleman, 667 F.3d at 861).

15

intent on the City's part.  But Bell has also presented several other adverse (though not themselves "materially adverse") actions taken by City around the time of Bell's EEOC filings--actions that could also help to prove that City harbored a general retaliatory intent (cf. Coleman, 667 F.3d at 861). That would in turn make it more likely that City kept Bell off of the first shift because of his EEOC filings.  Each of those adverse actions is sought to be supported by a facially legitimate predicate, but each is also surrounded by circumstances calling into question such assertedly legitimate motivations.

When City's facially plausible reasons for the actions described earlier are weighed against Bell's claimed mosaic of circumstantial evidence, it is far from certain that a jury would find for Bell.  Indeed, when each of the situations Bell has described is taken on its own, it might well be concluded that City's innocent explanations for its actions are truthful.

But that prospect does not drive the result here.  Sylvester v. SOS Children's Vill. Ill. Inc., 453 F.3d 900, 903 (7th Cir. 2006) has told us that retaliation may be proved "by assembling a number of pieces none meaningful in itself [that]...when taken as a whole, provide strong support if all point in the same

direction."[7]  Given Bell's circumstantial evidence, a jury could reasonably determine that City would not have kept him from the first shift if he had never filed an EEOC charge.  Thus, if Bell submits evidence sufficient to make the showing of harm discussed in the preceding section, City will then have failed to prove that no reasonable jury could award damages to Bell under the ADEA's retaliation provision.

**CONCLUSION**

For the reasons stated here at some length, Bell has temporarily dodged the summary judgment bullet.  Bell is granted until July 15, 2013 to come forward with evidence as to how he was assertedly harmed by the exclusion of a first shift assignment in 2008.  This action is then set for a status hearing at 9 a.m. July 23, 2013 to discuss further proceedings.

_____
Milton I. Shadur
Date: June 21, 2013        Senior United States District Judge

---

[7] There is nothing illogical about that proposition. Suppose for example that an employer's stated reasons for taking three nonmaterial adverse actions against an employee appear nonpretextual, although lingering questions about pretext place the probability of legitimacy of each at 75%.  And suppose that the pretextual v. nonpretextual evaluation of a fourth adverse action--which meets the standard of materiality--is a 50-50 tossup.  In that situation the likelihood that all four reasons are nonpretextual is .75 to the third power times .5--about 21%. And if the individual likelihood of nonpretextuality of the nonmaterial adverse action were lower--say 60%--the same calculation (the familiar result of multiplying fractions) would reduce the 21% figure to about 11%.