```
                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION


ANDREW BELL,                    )
                                )
                Plaintiff,      )
                                )
       v.                       )     Case No. 11 C 686
                                )
CITY OF HARVEY, ILLINOIS,       )
                                )
                Defendant.      )
```

## MEMORANDUM OPINION AND ORDER

This Court's June 21, 2013 memorandum opinion and order ("Opinion," 2013 WL 3199976 (N.D. Ill. June 21) (Dkt.50))[1] held (1) that plaintiff Andrew Bell ("Bell") had presented sufficient evidence to permit a reasonable jury to find that he had satisfied the causation and protected activity requirements of a retaliation claim under the Age Discrimination in Employment Act ("ADEA") (Opinion at *4, 7)) but (2) that he had failed to satisfy its "material adverse action" requirement (Opinion at *6). Because Bell could not reasonably have anticipated what this Court would perceive as the only potential candidate for finding a materially adverse action -- and because summary judgment is intended as a substitute for trial when no material facts are in dispute (see Bank of Am., N.A. v. Mazon State Bank, 2007 WL 2714117, at *3-4 (N.D. Ill. Sept. 17)) -- this Court

---

[1] Further citation of the Opinion will simply refer to the "*" pagination in the Westlaw reproduction.

granted Bell an opportunity to file a supplemental submission to provide additional evidence. It warned Bell that if he were unable to submit sufficient evidence to reflect the materiality of his shift assignment, City's summary judgment motion would be granted (Opinion at *6).

Bell's first supplemental submission (B. Dkt. 52)[2] and City's response (C. Dkt. 54) raised as many questions as they answered, and this Court therefore granted Bell still another opportunity to supplement the record. Despite those two extra bites at the apple, Bell has been unable to produce facts sufficient to meet the material-adverse-action standard. Accordingly, for the reasons discussed below, City's motion for summary judgment must be and is granted.

**Standard of Review and Factual Background**

Because Opinion at *1 has already set out the often-repeated legal test for any summary judgment motion, there is no reason for its further rehearsal here. By the same token, this opinion will not rehash the entire factual background of Bell's case. Instead it incorporates by reference the Opinion's exhaustive

---

[2] Because of the proliferation of court-permitted filings, the parties' additional submissions will be cited by party name ("B." for Bell and "C." for City) followed by the docket number. So Bell's first supplemental submission will be cited as "B. Dkt. 52 at --," while City's response to Bell's second supplemental submission will be cited as "C. Dkt. 66 at --." Citations to exhibits attached to documents will add "Ex. --" to the appropriate document designation.

factual summary (id. at *1-3), and it details only factual developments arising since that denial.

## **Final Resolution**

To make out a retaliation claim under the ADEA, Bell must point to an employment action that is not only adverse but <u>materially</u> adverse -- that is, "severe enough to dissuade a reasonable employee from exercising statutory rights" (<u>Barton v. Zimmer, Inc.</u>, 662 F. 3d 448, 456 (7th Cir. 2011)). As <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 69 (2006) teaches, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters."

Bell argues that City's total refusal to assign him to the day shift during 2008 -- something that Bell characterizes as an "arbitrary shift assignment" -- qualifies as a materially adverse action. But as this Court has pointed out earlier, a change in hours would not ordinarily be sufficient on its own to dissuade a reasonable employee from filing a discrimination charge (see, e.g., <u>Goodman v. Nat'l Sec. Agency, Inc.</u>, 621 F. 3d 651, 654-55 (7th Cir. 2010)). Instead Bell must produce evidence of harm stemming from that change in hours (id.).

Bells' additional submissions have offered two primary arguments as to why the shift assignment assertedly caused him harm. First he has argued that the shift assignment "caused friction" in his marriage and that Acting Chief Denard Eaves

("Eaves") made the assignment knowing that such friction would result (B. Dkt. 52 Ex. 1 ¶¶8-9). And Bell has secondly contended that due to the shift assignment he was unable to take all of his scheduled leave time in 2008 (B. Dkt. 64 ¶¶14-15). Neither of those contentions suffices to stave off summary judgment.

Marital Discord?

Bell has relied primarily on his contention that the afternoon shift assignment caused friction in his marriage by (1) preventing him from spending time with his wife and (2) causing her to blame him for filing his initial EEOC complaint (B. Dkt. 52 ¶9). He has also stated that he looked forward to participating in summer activities with his family and could not do so because of his shift assignment (id.). Finally Bell insists that Eaves knew of those unfortunate consequences but nonetheless refused to grant him his desired shift assignment (id. ¶8).

In so arguing, Bell seeks to invoke Washington v. Ill. Dep't of Revenue, 420 F. 3d 658, 663 (7th Cir. 2005), which holds that a reassignment that would otherwise fail to rise to the level of a material adverse action may nonetheless constitute such action if an employer "set out to exploit a known vulnerability and did so in a way that caused a significant (and hence an actionable) loss." But Bell's claim falls short of Washington's standard for two reasons. First he fails to come forward with evidence that

Eaves knew of any friction (or potential for friction) in his marriage. But more fundamentally, Bell fails to demonstrate (even taking all evidence in the light most favorable to him) that his asserted marital discord and reduced family time constituted a significant harm.

Bell's first additional submission stated simply that Eaves knew "that [he] looked forward to spending summer activities with [his] family" and that "not letting [him] work days would cause friction in [his] marriage" (B. Dkt. 52 Ex. 1 ¶8). When pressed by this Court to provide more detail as to just how Eaves purportedly came to learn those things, Bell remained vague.

Indeed, Bell never responded directly to this Court's request in its brief November 20, 2013 memorandum order for something more than "his own ipse dixit to explain <u>how</u> Chief Eaves came to learn" that a particular shift assignment would cause friction in Bell's marriage. For instance, Bell failed to identify any conversation with Eaves in which Bell communicated his fear that a late shift assignment would strain marital relations. Instead Bell cited a labor management meeting in which he explained to Eaves and other City representatives his reasons for desiring the daytime shift (B. Dkt. 63 ¶7):

> I wanted to work the first shift from May to September because that period of time included my birthday, my wedding anniversary, my sister's birthday, my older brother's birthday, as well as the Memorial Day and July 4th Holidays. I explained to the group that ending my work day at 3 p.m. from May to September would

enhance the quality of my life.
That explanation conveyed to Eaves the belief on Bell's part that his quality of life would be enhanced by a more desirable shift assignment, but it surely did not carry with it the more troubling belief that the absence of that assignment would pose marital problems.

In another lame attempt to meet the required standard, Bell also attests that Eaves "knows that I have been married for a long time, and that I always try to take vacation to coincide with my birthday (May 24th) and my wedding anniversary" (id. at ¶8). But of course that knowledge (even with the benefit of a reasonable inference in Bell's favor) does not reasonably give rise to a belief that an afternoon shift assignment would likely cause marital discord. For his part, Eaves has stated that he was completely unaware of any marital problems that Bell may have had (C. Dkt. 58 Ex. 1 ¶¶14-18).[3] In sum, Bell has failed to produce evidence sufficient to permit a reasonable jury to find that Eaves knew that the shift assignment would cause harm to Bell's marriage or family life.

But more importantly, even if Eaves had known of Bell's purported marital problems, they would have not have been the

---

[3] Eaves' statement is not included here to create a factual dispute that would have to be resolved at trial (and that would hence cause the rejection of summary judgment). Instead it simply buttresses the conclusion that this Court's analysis has already reached.

sort of "vulnerability" spoken of in Washington. Unspecified "friction" -- which Bell does not contend led to lasting harm in his relationship, much less a drastic consequence such as divorce -- is not "severe enough to dissuade a reasonable employee from exercising statutory rights" (Barton, 662 F. 3d at 456). Bell's annoyance at his shift assignment does not qualify as material harm, and the possibility that Bell's wife may have shared his annoyance (and may even have directed some of her displeasure in his direction) makes no difference to the analysis.

Grube v. Lau Indus., Inc., 257 F. 3d 723, 728-29 (7th Cir. 2011) (emphasis in original) speaks in remarkably clear language to torpedo Bell's claim that his shift assignment constituted adverse action because it interfered with his marital relationship:

> For instance, Grube asserts that Lau "preyed upon [her] wifely instincts" knowing that she would choose to quit so that she could take care of her husband rather than accept a transfer to the second shift. During oral argument Grube's counsel further suggested that we should infer that her transfer to the second shift was deliberately designed to make her working conditions intolerable because she could no longer be a dedicated wife and caregiver for her husband . . . . Such sweeping generalities do little to bolster her claim. Indeed, were we to accept Grube's position, any transfer of a married female employee to a less desirable work assignment could serve as the basis for a Title VII claim.

Change the gender of the plaintiff in Grube and substitute "could not avoid friction with his wife" for Grube's "could no longer be

a dedicated wife and caregiver for her husband," and the reader is left with a clear instruction from above that Bell's argument cannot suffice.

Indeed, Bell seems to misunderstand the import of Washington, which repeatedly emphasizes that a plaintiff alleging a "mere" change in hours must show some way in which he or she was especially vulnerable to such a change. Bell does the exact opposite, pointing out for instance "the importance to me, and to other sergeants, of being able to bid by seniority," and the fact that "other sergeants shared my desire for certainty" (B. Dkt. 63 ¶7 with emphasis added). Rather than demonstrating a particularized hardship, Bell has succeeded in showing only that his objection to the inconvenience of the shift assignment is the same as any other employee's would be.

Nor is a desire to spend summer evenings with one's family a "vulnerability" unique to Bell. Is he somehow alone in his preference for spending summer nights with his family rather than in his workplace?[4] Come now -- if that preference alone could make an adverse action "material," our Court of Appeals' repeated warnings that a change in hours does not by itself constitute material adverse action would lose all force.

---

[4] In this context Bell's reference to the Memorial Day and July 4th holidays is particularly bizarre. He cannot possibly believe that failing to get his preferred hours on the days surrounding Memorial Day qualifies as a unique vulnerability.

Even more strikingly, Bell's inability to spend his preferred hours with his family for a period of several months contrasts sharply with the significant economic harm suffered by the plaintiff in Washington, whose shift change effectively cut her wages by 25% (Washington, 420 F. 3d at 662). Instead Bell's complaints are far more comparable to those of the plaintiff in Grube, 257 F. 3d at 728:

> In support Grube contends that a change in shift would have disrupted her life, pointing to her over twenty year tenure on the first shift. But were we to hold that a mere change in working hours would rise to the level of creating a condition so objectively unbearable as to allow an employee to quit and then bring a claim of constructive discharge, employers would be in a most precarious position in adapting and maintaining employee's work schedules to fit within the parameters of their business needs.

That is not to say that satisfying Washington's known-vulnerability standard necessarily requires significant economic harm. But at the very least a plaintiff "must allege more than a dislike for her new assignments or a preference for her old ones for her case to go forward" (Vance v. Ball State Univ., 646 F. 3d 461, 474 (7th Cir. 2011)). So Bell has struck out on the first contention that he has advanced.

Scheduled Leave

At first blush Bell's next effort seemed more promising: His second supplemental submission said that he was unable to take all his scheduled leave time for 2008 (B. Dkt. 63 ¶¶14-15). Bell explained that he was required to coordinate his scheduled

leave with other sergeants, and in December 2007 (in accordance with standard procedure) he submitted leave requests for the entirety of 2008.  After Bell's shift assignment changed, he could not take scheduled time off when it conflicted with time requested by other sergeants.  Bell contends that his coordinated leave schedule thus became "useless" (id.).

Inability to use accrued vacation time might in appropriate circumstances qualify as the sort of "demotion evidenced by a decrease in wage or salary" or "material loss of benefits" sufficient to constitute materially adverse action (Lavalais v. Village of Melrose Park, 734 F. 3d 629, 634 (7th Cir. 2013)).  But that apparent possibility was quickly dispelled in this case by City's response.  City notes (and provides attendance records to prove) that Bell took a total of 28 vacation days, not including weekends, between May 25 and September 1, 2008 (C. Dkt. 66 at 6). That vacation period included Bell's birthday and his anniversary.  It defies common sense to argue that an inability to take more than 28 vacation days over the period of four months could be a punishment "severe enough to dissuade a reasonable employee from exercising statutory rights" (Barton, 662 F. 3d at 456).

Moreover, Bell did not lose vacation days that he was unable to use in 2008:  As City points out in its response, because police and firefighters frequently have difficulty utilizing all

of their accrued leave, they apply excess leave to early retirement (C. Dkt. 66 at 6). Bell's claimed harm therefore consists entirely of his not being permitted to take in excess of 28 days of vacation during 2008. So his second argument also fails.

Other Non-Issues

All of Bell's remaining contentions focus on ultimately irrelevant aspects of the case, such as whether standard shift procedure was followed or whether it would have been helpful to have greater notice of his shift assignment. Like the already-discussed arguments, those contentions do not aid Bell in providing a genuine issue of material fact as to whether a reasonable employee would have been dissuaded from exercising statutory rights or whether the City took advantage of a known vulnerability on Bell's part.[5]

**Conclusion**

This Court does not doubt that Bell felt genuinely aggrieved by his summer shift assignment. That assignment might indeed have been undesirable and even frustrating. But an employee's sense of aggrievement does not qualify as a particularized hardship, and undesirable hours do not by themselves make an

---

[5] Because City has prevailed on its motion, this opinion need not address City's additional arguments regarding alleged contradictions between Bell's affidavit and his deposition testimony.

adverse action "material."  Accordingly City is entitled to a judgment as a matter of law, and its motion for summary judgment must be and is granted.

_____
Milton I. Shadur
Senior United States District Judge

January 22, 2014